"The jurors for the State, upon their oath present that Moses A. Curtis, William B. Otis, and James G. Rowe, all, etc., on, etc., with force and arms in the county aforesaid, unlawfully, riotously and routously did assemble and gather together to disturb the peace of the State; and being so then and there assembled and gathered together with (364) force and arms, to wit: with sticks, axes, and other offensive weapons, in the county aforesaid, into a certain dwellinghouse there situate, and being, and then and there in the possession of one William H. Pope, unlawfully, riotously and routously did violently, forcibly, injuriously, and with strong hand enter; and the said Moses A. Curtis, *Page 290 
William B. Otis, and James G. Rowe, then and there with force and arms, to wit: with sticks, axes, and other offensive weapons, unlawfully, riotously and routously did violently, forcibly, injuriously, and with strong hand the said William H. Pope from the possession of the said dwellinghouse expel, amove and put out; and the said William H. Pope so as aforesaid expelled, amoved and put out from the possession of the said dwellinghouse, then and there with force and arms, to wit: with sticks, axes, and other offensive weapons, unlawfully, riotously and routously did violently, forcibly, injuriously, and with strong hand keep out, and still keep out, to the great damage of the said William H. Pope, and against the peace and dignity of the State."
Upon the trial of this indictment the jury returned the following special verdict, to wit: "That on the first day of January, 1838, the defendant Curtis, was and continually since hath been the lessee for a term of years, lawfully in possession of a certain tract or parcel of land near the City of Raleigh, and there, during all the time aforesaid, kept a boarding school for boys. On this land were several large buildings, in one of which the said Curtis and his family resided as their dwelling house, and others were used for the accommodation of the scholars; and there was also a small outhouse (amongst others) containing two rooms, situated in the yard or curtilage inclosing the said dwellinghouse and pupils' houses, but the said outhouse was not connected with the said dwelling house by any common roof or covering, but the door of the said outhouse opened into the yard; that this outhouse had been originally built and used for recitation rooms for the pupils, but after the completion of the buildings for their accommodation, was used for lodging rooms by the servants attached to the establishment; that some time in the said month of January, the said Curtis being such lessee, (365) and keeping said school as aforesaid, hired the said William H. Pope, in the indictment mentioned, as a servant and steward for the residue of the year at $ ______ per month as his wages — it being understood that he was likewise to be furnished with board and lodging suitable to his station in the family, though no express engagement was made therefor. For two years previous to the year 1838 the said Pope had held the same situation of servant in the same school then kept by other proprietors, and occupied one of the rooms in the said outhouse during that period as his lodging room. And the said Pope, by the permission and assent of the said Curtis (after his employment by Curtis as aforesaid) occupied the same room of the said outhouse as his lodging room, and so continued to occupy it until his removal therefrom as hereinafter stated, the other room in the said outhouse being unoccupied; that the said Pope did not rent, lease, or hire the said room of the defendant Curtis, nor make any engagement for the use or occupation of *Page 291 
the same, but merely used it in his character of steward and servant as aforesaid; that on 23 October, 1838, the said Curtis having discovered that the said Pope had sold certain small articles to some of the pupils, contrary to a rule of his school, discharged him from his situation as steward and servant, and ordered him to leave the premises; the said Pope, after he was so out of his said employment in the service of the defendant Curtis, continued to occupy the said room, alleging as a reason for not leaving it as required that he was building a house, and until that was completed he could not remove, as he had no place in which to deposit and secure his bed and other articles which were in the said room; that on the day mentioned in the indictment the defendant Curtis, accompanied by the other defendants, one of whom was an assistant teacher and the other a boarder of the said Curtis, went to the said room and required the said Pope immediately to remove therefrom, to which Pope replied he could not remove until the next succeeding Monday, when he promised that he would go out. Curtis told him he must go out before the night of that day, as he would not permit him on any account to remain on his premises another night. On this, Pope came out of the room, locked the door, and put the key in his (366) pocket. Curtis demanded the key, which Pope refused to give up, and thereupon the defendant Rowe told him, cost what it might, even if it were a thousand dollars, he must leave that very day, and ordered an axe and chisel to be brought, and the same being brought the defendant therewith forced the door open, took it from its hinges, forced out the window sashes, and removed both the door and windows from the said room; that the said Pope, so soon as the axe was brought and the defendants had commenced forcing the door, left the premises, and on his return an hour afterwards the door and windows being removed, and he by reason thereof unable to occupy the room, proceeded to remove and did remove his bed and other articles therefrom.
And whether, upon the whole matter, the defendants, or either of them, are or is guilty, the jury is ignorant, and party the order of the court; and if the court shall be of opinion that they are, or either of them is, guilty, then the jury find him or them guilty of the matters in the said indictment charged; otherwise they find the defendants not guilty."
His Honor, being of opinion upon this verdict that the defendants were guilty in law, pronounced a judgment against them, from which they appealed.
The indictment does not charge any injury to the person of the prosecutor. Nor is it framed under the statutes of forcible entry and detainer; and it is admitted that it could not have been so framed for the want of any estate in the prosecutor. It is then merely an indictment, at common law, for a forcible entry into a dwelling-house in the possession of Pope and expelling him therefrom. The verdict finds an entry and expulsion in such a manner as to make the defendants guilty, in our opinion, provided the house was in law the dwellinghouse of the prosecutor. We think, however, that it was the dwelling house of Mr. Curtis, and in his possession, both according to legal (367) intendment and the common understanding of the country; and therefore, that it was not in the possession of Pope.
The rule upon this subject is laid down in general and very plain terms by Mr. East, P. C., 500: "If a person occupy a dwellinghouse as the servant or part of the family of another, it is the occupation in law of such other person, and must be so laid in the indictment." The reason must be clear to every mind. The occupation of servants is not suo jure, but as servants, and representing their master, and therefore it is the occupation of the proprietor himself. There may be cases in which the master lets to his servant a tenement or part of his premises on rent, in which the house and possession would be properly laid as those of the servant, for although the relation of master and servant existed between those parties, yet that of landlord and tenant, quoad the premises let, also existed. And even where there is no stipulation for rent, yet the premises occupied by the servant may be so far removed and distinct from those in the personal occupation of the master, that they may be deemed and stated to be in the possession of the servant, in an indictment, for instance, for burglary. It would seem from some adjudications that in this last case it may be laid either way. But in treating the master's house, occupied by the servant, as the servant's house in any case, there is manifestly a departure from the general rule quoted, and therefore those cases are to be regarded as exceptions, founded on particular circumstances. There is, however, no fact or circumstance to bring this case within the reason of any exception hitherto admitted, but everything to make it fall under the operation of the general principle. The house in question is within the curtilage and is parcel of the premises belonging to and actually occupied by Mr. Curtis. It had not been let to Pope at a rent. Nay, the jury find that there was no engagement of any sort for Pope's use and occupation of this house in particular, and that he "merely used the lodging room in his character of servant." It is obvious, therefore, that Pope was put to lodge in the room at the mere will of his master, and that this was for the more convenient performance of the service to be rendered by him as a domestic, and for *Page 293 
that reason only. These was no severance of this from the other (368) parts of the premises, and we think clearly, that Pope had no possession of his own, but that his possession as servant was just as much the possession of his master as if they had occupied separate rooms under the same roof. Rex v. The Inhabitants of Cheshire, 1 Barn. and Ald., 473; Stockles' and Edwards' case, 2 Leach C. C., 1015, and R. and R. C. C., 185. In the latter case Lord Ellenborough remarks that a servant who lived with his family in particular rooms of his master's house by his leave, could not maintain trespass against his employers if they entered the rooms without his consent; and he asks, "does a gentleman, who assigns to his coachman the rooms over his stables thereby make him a tenant?" In the same case, Mansfield, C. J., uses this language: "Many servants, as, for instance, porters at park gates, have rooms assigned to them to live in, and surely if a master choose to turn away his servant it does not follow that he cannot evict him until the end of the year." A very common instance of this relation in this State exists in the case of employer and overseer. Certainly it has never been understood among us when a planter places an overseer on his plantation to superintend his operations and hands there, that he puts him into possession as against himself, so that he cannot turn him off during the year, but that the overseer may remain against the will of the master in possession, perhaps, of the only house fit for the occupation of a second overseer or of the owner himself. On the contrary, it is clear law and universally received, that the houses on the plantation are as much in the possession of the owner as the plantation itself, or the hands, provisions, or horses on it, and it would work an intolerable inconvenience to employers and detriment to agriculture to hold otherwise. The redress of the overseer is by action on the contract of the employer, and not by holding over that which was never in his possession for an instant, but as the servant and agent of his employer. So, in the present case, Mr. Curtis never parted from or lost his possession, and consequently the house was never in possession of Pope. When Mr. Curtis dismissed the man from his service he had a right also to exclude him from his premises; provided, as in this case, he did so without injury to (369) his person or other breach of the peace.
For these reasons the judgment, in the opinion of this Court, is erroneous, and the usual certificate must be sent down in order that judgment may be entered on the special verdict for the defendants.
PER CURIAM. Judgment reversed.
Cited: State v. Pridgen, 30 N.C. 87; State v. Boyden, 35 N.C. 508;Watson v. McEachin, 47 N.C. 211; State v. Jake, 60 N.C. 473; State v.Smith, 100 N.C. 468. *Page 294